# EXHIBIT A

Westlaw

Not Reported in F.Supp.2d
2001 WL 789408 (D.Del.)
**(Cite as: 2001 WL 789408 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
COMPAQ COMPUTER CORP., et al., Plaintiff,
v.
INACOM CORP., et al., Defendants.
**No. C.A. 01-108 GMS.**

July 12, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

*1 On June 16, 2000 (the "Petition Date"), Inacom Corporation ("Inacom"), and certain of its subsidiaries filed bankruptcy petitions under Chapter 11 of the Bankruptcy Code. In connection with these ongoing bankruptcy proceedings, Compaq Computer Corporation ("Compaq") and its wholly-owned subsidiary, Custom Edge, Inc. ("CEI") (collectively, "the plaintiffs"), brought this adversary proceeding against Inacom and its pre-petition lenders (the "Bank Group defendants") to recover an unspecified amount of funds allegedly collected and then spent by Inacom prior to the Petition Date. In their complaint, which was filed on October 20, 2000, the plaintiffs allege that Inacom received approximately $100 million belonging to them, wrongfully retained that money, and paid a substantial amount of it to the banks. [FN1]

> FN1. The plaintiffs had also previously filed a complaint on September 20, 2000, however, that complaint was never served. By stipulation and order, these adversary proceedings were consolidated.

Presently before the court is the Bank Group defendants' motion to dismiss the plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. After reviewing the submissions of the parties and hearing the parties' arguments at oral argument held on May 31, 2001, the court concludes that the plaintiffs have sufficiently stated a claim upon which relief can be granted. Thus, the court will deny the Bank Group

defendants' motion to dismiss.

*MOTION TO DISMISS STANDARD*

The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, in deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Tp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). The court will only dismiss a complaint if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)). Thus, in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

*BACKGROUND*

The following facts are taken from the allegations in the complaint, which the court must accept as true for the purposes of deciding this motion. The plaintiffs, Compaq and CEI, agreed under an Asset Purchase Agreement, dated January, 4, 2000, to purchase for approximately $370 million and other considerations, Inacom's operations and assets of its custom configuration and distribution business, as well as other assets, including certain receivables and inventory. D.I. 1, ¶ 9. At this same time, Inacom was a party to a Credit Agreement, with a group of Lenders, (generally, "the Bank Group defendants"). D.I. 1, ¶ 10. Deutsche was the administrative agent for the Lenders and dealt directly with Inacom on behalf of the Lenders. *Id.* In order for Inacom to enter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

into the Asset Purchase Agreement with Compaq, the Lenders had to waive certain covenants of the Credit Agreement. D.I. 1, ¶ 11. In consideration for granting the waivers, the Lender required amendments to the Credit Agreement, which were set forth in a Third Amendment and Waiver dated January 4, 2000. *Id.* The Credit Agreement was again amended in connection with the transactions contemplated in the Asset Purchase Agreement on February 15, 2000. D.I. 1, ¶ 12.

*2 On February 16, 2000, the transactions contemplated by the Asset Purchase Agreement closed. D.I. 1, ¶ 14. At the closing, Compaq transferred about $370 million in cash, in part to Inacom and in part to the Lenders. *Id.*

As an integral part of the sale, CEI and Inacom entered into several related agreements defining their prospective business relationship, including a Services, Supply, and Sales Agreement. ("SSS Agreement"). D.I. 1, ¶ 15. The plaintiffs allege that under the SSS Agreement, Inacom agreed to act as agent for CEI in certain transactions in which CEI would sell hardware and related procurement services to Inacom's service customers. D.I. 1, ¶ 16. CEI would be responsible for issuing the relevant invoices, and collecting the payments generated from the sales, known as the "New Receivables." *Id.*

At the time of the closing, there were outstanding invoices due to Inacom for sales made prior to the closing. ("Old Receivables"). D.I. 1, ¶ 18. The plaintiffs do not dispute that these Old Receivables belong to Inacom.

The plaintiffs allege that "for some time after closing" all of the parties involved knew that payments of New Receivables would likely be mistakenly paid to Inacom rather than to CEI. D.I. 1, ¶ 19. Thus, the parties recognized that it would be necessary to establish a reconciliation process to identify misdirected payments so that Inacom could then transfer those funds to CEI, which owned the funds. D.I. 1, ¶ 20. CEI alleges that it took steps to minimize the number of misdirected payments, including sending separate notices to customers of the change in the lockbox to which payments should be made. D.I. 1, ¶ 19

As anticipated, many customers owing funds to CEI on account of New Receivables mistakenly made payments to Inacom. D.I. 1, ¶ 21. Beginning in early March 2000, Inacom started receiving a large number of payments for New Receivables in large amounts.

*Id.* It is alleged that between March 1 and April 21, 2000, Inacom received about $310 million, of which about $99 million belonged to CEI. Inacom senior officers were aware that Inacom had received and continued to receive large sums of New Receivables. *Id.* The complaint alleges that despite this knowledge, Inacom took no action to set aside or reserve funds belonging to CEI and instead paid those funds to others, including the Lenders. D.I. 1, ¶ 22.

It is also alleged that the Lenders knew, or should have known, that Inacom was receiving a substantial amount of money that belonged to CEI. D.I. 1, ¶ 23. In particular, the plaintiffs allege that 1) the Lenders "reviewed and were familiar with the Asset Purchase Agreement, the SSS Agreement and other agreements between CEI and Inacom, *id.;* 2) the Lenders received detailed financial information from Inacom, D.I. 1, ¶ 24; 3) the Lenders should have known that the amounts received by Inacom far exceeded the amounts attributable to Inacom's remaining business, D.I. 1, ¶ 25 and 4) Inacom and Deutsche had frequent communication about the cash available to Inacom, and on information and belief, all excess funds not needed for day to day operation of Inacom were paid to the Lenders, which received substantial amounts of CEI's money. D.I. 1, ¶ 26.

*3 By April 21, 2000, the initial reconciliation process was completed. D.I. 1, ¶ 27. CEI determined and advised Inacom of the specific misdirected payments to Inacom totaling $99 million. *Id.* According to the complaint, Inacom confirmed the accuracy of this amount and agreed to repay the amount owed to CEI, which after offsets, was approximately $88 million. *Id.* Inacom had available to it under the Credit Agreement sufficient funds to make the payment, and sought to draw the funds. However, the Lenders refused to advance such funds to Inacom. Thus, Inacom has not yet repaid any of the pre-April 21 misdirected payments. D.I. 1, ¶ 28.

The complaint further alleges that between April 21 and June 15, Inacom continued to receive substantial amounts of misdirected payments. D.I. 1, ¶ 29. Inacom did pay certain funds to CEI, but CEI alleges that Inacom wrongfully retained approximately $5 million belong to CEI. *Id.* Furthermore, CEI alleges that since the Petition date, Inacom has received approximately $10.5 million of CEI's money. D.I. 1, ¶ 30. These post-petition CEI payments have not been turned over to CEI.

*DISCUSSION*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 789408 (D.Del.)
(Cite as: 2001 WL 789408 (D.Del.))

Page 3

A. Parties' Arguments

In their motion to **dismiss**, the Bank Group defendants argue that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. Specifically, the Bank Group defendants claim that the plaintiffs have failed to state a claim for breach of fiduciary duty and for aiding and abetting Inacom's alleged breach of fiduciary duty. In addition, the Bank Group defendants argue that the plaintiffs' equity based claims--3) **unjust enrichment,** 4) a constructive trust and 5) equitable subordination, should also be **dismissed** because the dispute is governed by a valid **contract** [FN2]

> FN2. The Bank Group defendants argue that New York law applies to this case. However, the court agrees with the plaintiffs, and finds that a definitive choice of law determination is inappropriate at the Rule 12 phase of a case. *See Federal Ins. Corp. v. Jefferson Bank and Trust,* 937 F.Supp. 1461, 1466 (D.Colo.1996).

In their complaint, the plaintiffs do not set forth any specific legal theories or causes of action. Rather, they allege that they are entitled to relief because the Bank Group defendants have "breached, aided and abetted the breach of fiduciary and other duties ..., have misappropriated [property], have wrongfully refused to return the property held in trust ..., and have been unjustly enriched." D.I. 1, ¶ 34. Also, in their briefing on the motion to dismiss, the plaintiffs allege that they are entitled to relief because the Bank Group defendants hold the disputed funds in constructive trust.

B. Analysis

At the outset, the court emphasizes that under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only include a "short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2). Rule 8(a)(2) does not require a claimant to set forth any specific legal theory justifying the relief sought on the facts alleged. *See* 2 *Moore's Federal Practice,* Section 8.04[3] at 8-26; *Cf. Rose Hall, Ltd v. Chase Manhattan Banking Corp.,* 93 F.R.D. 858, 862 (D.Del.1982). Thus, the federal rules do not require the plaintiffs to "plead law or match facts to every element of a legal theory." *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998)

*4 In light of Rule 8, the court cannot conclude as a matter of law that the plaintiffs are not entitled to relief based upon the facts alleged in the complaint. Although both parties vigorously argue the strengths and weaknesses of the different possible legal theories available to the plaintiffs, the court concludes that the principal facts alleged by the plaintiffs sufficiently state a claim against the defendants.

Essentially, the plaintiffs have alleged that Inacom received more than $100 million dollars which belonged to CEI, that Inacom held CEI's funds in trust for CEI, and failed to set aside or reserve funds belonging to CEI. Instead Inacom paid those funds to others, including the Bank Group defendants. Thus, according to the plaintiffs, the Bank Group defendants received substantial amounts of CEI's money, and the Bank Group defendants knew or should have known that the payments made to them by Inacom included CEI's money.

Under basic trust law principles, "[w]here a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." *See Restatement of Restitution § 160 (1937).* When property held in constructive trust is transferred to a third party who is not a bona fide purchaser, "the interest of the beneficiary is not cut off. In such a case he can maintain a suit in equity to recover the property from the third person, at least if his remedies at law are not adequate." *See id.* cmt. g. *See also Norfolk and Western Railroad Co. v. Central Indus., Inc.,* Civ. A. Nos. 86- 2613, 88-4348, and 88-4349, 1989 WL 36958, at *6 (E.D.Pa. Apr. 12, 1989) ("[a] trust beneficiary can recover the trust property from the trustee or one holding it with notice of the breach of trust"). In addition, "[w]here a person holding property in which another has a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to the interest of the other, unless he is a bona fid purchaser. *See Norfolk and Western Railroad Company,* 1989 WL 36958, at *6 (citing *Restatement of Restitution § 168*).

Thus, basic trust law principles support the plaintiffs' argument that they would be allowed to recover from the Bank Group defendants any funds which were held in constructive by Inacom and transferred to the Bank Group defendants where the Bank Group defendants knew or should have known that the funds belonged to the plaintiffs. In further support of their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 789408 (D.Del.)
**(Cite as: 2001 WL 789408 (D.Del.))**

argument, the plaintiffs cite to *United States v. NBD Bank, N.A., 922 F.Supp. 1235 (E.D.Mich.1996)*. In *United States v. NBD Bank, N.A., 922 F.Supp. 1235 (E.D.Mich.1996)*, the government sought to recover funds which were improperly diverted from a federally back mortgage program and paid to the defendant bank in repayment of a loan. *See id.* at 1240-41. The *NBD Bank* court held that the funds at issue where held in constructive trust because it was not disputed that the constructive trustee [another bank] did not have an equitable interest in the funds when it took the disputed funds for its own purposes. *See id.* at 1242. In addition, the court held that where the defendant, to whom the constructive trustee transferred the disputed funds, knew that the disputed funds were being held in trust, they could not be a bona fide purchaser of the funds. *See id.* at 1245.

**\*5** In light of basic trust law principles and *United States v. NBD Bank, N.A.,* the court cannot determine as a matter of law, at this an early stage in the case, that the plaintiffs would not be entitled to relief under any theory. Thus, the court concludes that the plaintiffs have adequately stated a claim upon which relief can be granted. For these reasons, the court will deny the Bank Group defendants' motion to dismiss.

For these reasons, IT IS HEREBY ORDERED that:

1. The Bank Group Defendants' Motion to Dismiss is DENIED.

2001 WL 789408 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

· 1:01CV00108 (Docket) (Feb. 15, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
**(Cite as: 2004 WL 1949300 (Del.Ch.))**

Page 1

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
BREAKAWAY SOLUTIONS, INC.
v.
MORGAN STANLEY & CO. INC., et al.
**No. Civ.A. 19522.**

Submitted Oct. 21, 2003.
Aug. 27, 2004.

Dear Counsel:

NOBLE, Vice Chancellor.

**\*1** Plaintiff Breakaway Solutions, Inc. ("Breakaway") is a bankrupt publicly held, internet-related corporation. Defendants Morgan Stanley & Co. Inc., Lehman Brothers, Inc., and Deutsche Bank Securities, Inc. (collectively the "Defendants" or the "Underwriters") are among this nation's leading underwriters of Initial Public Offerings ("IPOs"). Breakaway brought this purported class action on behalf of the technology companies that hired the Defendants as underwriters for their IPOs in the late 1990's and into 2000, and saw the price of their stock increase dramatically in a short period of time following their IPOs. Breakaway alleges that the Defendants allocated the newly issued stock to favored clients who then shared with the Defendants a portion of the profits realized from the large increase in stock price following the IPO. Breakaway has set forth five causes of action under state law: breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and indemnification. The Defendants have moved to dismiss the Complaint [FN1] under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

> FN1. References to the "Complaint" are to the Plaintiff's Amended Class Action Complaint.

## I. BACKGROUND

This dispute grew out of the stock market boom of the late 1990's and the technology stocks which

fueled it. More specifically, this boom was spearheaded by companies which, seeking capital for their new businesses, engaged in an IPO. Those companies retained underwriters who used their expertise to evaluate the corporation, to determine the number of shares to offer and the offering price of those shares, and to distribute the shares to the public in order that the shares might be subsequently traded by the public.

The relationship between underwriters and the issuer is established by the underwriting agreement. Among other things, the underwriting agreements obligate the underwriters to acquire the IPO securities from the issuers at a fixed price and then to resell the securities to the public in accordance with the terms set forth therein. Moreover, the agreements typically provide for indemnification and contribution in the event a claim or liability results from the issuance of the shares.

The underwriters derive the compensation for their services from the spread between the fixed, discounted price at which they acquire the securities from the issuer and the public offering price at which they resell the securities to investors. This agreed upon spread is customarily 7% of the total IPO proceeds.

Amid the stock market boom, reports began to surface regarding two interrelated practices allegedly engaged in by underwriters, such as the Defendants. The first of these practices, known as "underpricing," involved efforts of the underwriters to set the price of the IPO stock lower than its true value. The second alleged practice was that the underwriters would profit from this underpricing by allocating IPO securities to favored clients in exchange for payments ("kickbacks") or other consideration from those clients pursuant to side agreements. These payments were in addition to the fees received by the underwriters by way of the underwriting spread.

**\*2** Breakaway, an internet company, provided technical, operational, management, and other services to electronic and other businesses. Breakaway's shares were initially offered to the public on or about October 6, 1999, in accordance with an underwriting agreement (the "Agreement") with the Defendants, dated October 5, 1999. Breakaway alleges that the terms of the Agreement,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 2
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

to which Breakaway agreed in reliance upon the Defendants' expertise, were as follows: Breakaway sold 3,000,000 shares of its common stock to the Defendants and other members of the underwriting syndicate for $13.02 per share, or $39,060,000 total. The underwriters were to sell the shares to the public at $14 per share; their 7% spread amounted to $0.98 per share. Subsequently, the Defendants and the other members of the syndicate exercised their "over-allotment" option in the Agreement to acquire a contractual maximum of 450,000 addition shares from Breakaway, also at $13.02 per share, for $5,859,000. As a result, Breakaway's IPO generated gross proceeds of $48.3 million, or approximately $44.9 million to Breakaway net of the underwriting fee.

Breakaway's stock price soared the day it began trading, rising as high as $71.00 per share from the initial $14.00 and closing at $42.25, more than triple the offering price. Breakaway alleges that, at these trading prices, it "left money on the table" in an amount between $196 million ($71.00 per share times 3,450,000 shares minus $48 million raised by the IPO) and $97 million ($42.25 per share times 3,450,000 shares minus $48 million). Breakaway was not alone in experiencing this rapid growth, and the tripling of its IPO price was far from the most extreme example of such rapid escalation. [FN2]

> FN2. Breakaway points to numerous other examples of such rapid stock price increases. The Complaint refers to data published by Professor Jay Ritter of the University of Florida. The ten largest first-day IPO percentage increases all took place within the period covered by the Complaint. For instance, VA Linux closed on December 9, 1999 with a 697.50% increase, Globe.com closed on November 13, 1998 with a 606% increase, Foundry Networks closed on September 28, 1999 with a 525% increase, Webmethods closed on February 11, 2000 with a 507.5% increase, Free Markets closed on December 10, 1999 with a 483 .33% increase, Cobalt Networks closed on November 5, 1999 with a 482% increase, Marketwatch.com closed on January 15, 1999 with a 474% increase, Akamai Technologies closed on October 29, 1999, with a 458% increase, Cacheflow closed on November 19, 1999, with a 426.56% increase, and Sycamore Networks closed on October 22, 1999 with a 386% increase.

The Complaint focuses on side agreements between the Defendants and their favored clients or the "kickbacks" (as characterized by Breakaway) which the Defendants received in relation to the underpriced IPO shares described above. These side agreements frequently took the form of allowing the Defendants to share directly in the profits of clients who quickly sold (or "flipped") the particular IPO stock to other investors in the after-market; increased or excessive trading commissions paid by the favored clients in connection with the IPO stock or other securities transactions; and other similar arrangements. If the client declined to compensate the Defendants with at least part of its profits, the client would be denied future allocations of similarly underpriced IPO shares.

These allocation and compensation practices, according to Breakaway, permitted the Defendants to obtain millions of dollars in compensation from IPOs in addition to their contracted 7% underwriting fee. Moreover, this additional compensation frequently exceeded--Breakaway alleges that it often dwarfed--the underwriting fee that the Defendants contractually agreed to charge.

## II. CONTENTIONS

In its Complaint, Breakaway alleges that the offending conduct sustains five causes of action based on state law. [FN3] The first is a "standard" breach of contract claim. Breakaway claims that the Defendants' IPO allocation and profit sharing concerning the underpriced shares breached the Agreement. Specifically, Breakaway contends that express contract terms related to pricing and compensation were breached by the Defendants' receiving more compensation than that allowed by the Agreement and that, by selling to favored clients, the IPO was not a "public" one. Second, Breakaway contends that the Defendants breached the implied covenant of good faith and fair dealing through the selective sale of the IPO shares because the "spirit and intent" of the Agreement were violated as consideration was diverted away from Breakaway and into the Defendants' own pockets. Third, Breakaway claims that the Defendants were its fiduciaries and they breached their fiduciary duties through the challenged practices. Fourth, Breakaway asks for indemnification or contribution for federal securities actions that have been brought against it and those similarly situated and which arose out of their IPOs. Finally, Breakaway brings a claim for unjust enrichment and restitution, asserting that the Defendants should be required to surrender their excessive compensation since it would be inequitable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

for them to retain it.

> FN3. The Agreement expressly provides that New York law will govern, and the parties agree that New York law applies.

**\*3** The Defendants have moved to dismiss the Complaint. Their primary argument is that Breakaway's claims are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). [FN4] They argue that, although Breakaway does not affirmatively allege fraud, the substance of its claims, all premised on state law, is based on fraud, especially the focus on underpricing and kickbacks, thus bringing its claims within the grasp of SLUSA. They also allege that Breakaway has failed, as a matter of law, to state claims for breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment, and that the indemnification claim is not ripe for judicial review.

> FN4. 15 U.S.C. § § 77p, 78bb.

Breakaway, not surprisingly, disputes these contentions.

### III. ANALYSIS
#### A. *Standard of Review*

Under Court of Chancery Rule 12(b)(6), the Court is bound to consider only the allegations of the complaint and any documents that are considered integral to it. [FN5] In deciding the motion, the Court must assume the truthfulness of all well-pled facts in the complaint and view those facts, as well as all inferences that may be drawn reasonably from them, in the light most favorable to Breakaway. [FN6] However, conclusory allegations, unsupported by the facts in the complaint, will not be taken as true. [FN7] No motion under Rule 12(b)(6) may be granted unless it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proven at trial to support a cause of action. [FN8]

> FN5. *Beam v. Stewart,* 833 A.2d 961, 970 (Del. Ch.2003), *aff'd* 845 A.2d 1040 (Del.2004).

> FN6. *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l. Fund, L.P.,* 829 A.2d 143, 148-49 (Del. Ch.2003); *Orman v. Cullman,* 794 A.2d 5, 15- 16 (Del. Ch.2002).

> FN7. *Anglo Am. Sec. Fund,* 829 A.2d at 149.

> FN8. *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

#### B. *SLUSA*

Congress enacted the Private Securities Litigation Reform Act [FN9] (the "PSLRA") in 1995 in response to what it perceived to be frivolous private securities lawsuits that were damaging the market. [FN10] The PSLRA imposed more stringent procedural and substantive requirements for private securities actions in the federal courts as a way to deter meritless suits. [FN11] To avoid these requirements and the reach of the PSLRA, many actions alleging fraud in the sale of securities were filed in the state courts based on state statutory or common law. [FN12] To end this practice, which it perceived as a loophole, Congress enacted SLUSA in 1998 to preempt completely certain securities fraud claims, thereby making federal law the exclusive source of substantive rules and to force those claims generally into the federal courts. [FN13]

> FN9. 15 U.S.C. § § 78u-4 to 78u-5.

> FN10. *Zoren v. Genesis Energy, L.P.,* 195 F.Supp.2d 598, 602 (D.Del.2002); H.R. CONF. REP. NO. 104-369, at 31-32 (1995).

> FN11. *Gibson v. PS Group Holdings, Inc.,* 2000 WL 777818, at \*2 (S.D.Cal. Mar. 8, 2000).

> FN12. *See, e.g., Korsinsky v. Salomon Smith Barney, Inc.,* 2002 WL 27775, at \*3 (S.D.N.Y. Jan. 10, 2002); *Feitelberg v. Credit Suisse First Boston LLC,* 2003 WL 22434098, at \*2 (N.D.Cal. Oct. 24, 2003).

> FN13. *Araujo v. John Hancock Life Ins. Co.,* 206 F.Supp.2d 377, 380 (E.D.N.Y.2002). *See also* H.R. CONF. REP. NO. 105-803, at 13 (1998) (The aim of SLUSA is "to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal Court.").

SLUSA provides, in pertinent part:
> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or

(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security. [FN14]

> FN14. 15 U.S.C. § 77p(b). "SLUSA contains two identical preemption and removal provisions; one is found at 15 U.S.C. § 77p(b) and the other is found at U.S.C. § 78bb(f). The difference is that the former applies to remedies available under the Securities Act of 1933 and the latter applies to remedies available under the Securities Exchange Act of 1934." *Gray v. Seaboard Sec., Inc.,* 241 F.Supp.2d 213, 218 n. 8 (N.D.N.Y.2003). While the two formulations may be substantively the same, the phrase "untrue statement" in § 77p(b), quoted above, appears as "misrepresentation" in the corresponding provision of § 78bb(f).

Therefore, this action must be dismissed if it is (1) a "covered class action" (2) based on state law (3) involving a "covered security" (4) alleging either (a) a misrepresentation or omission of a material fact or (b) the use of any manipulative or deceptive device or contrivance (5) "in connection with" the purchase or sale of a covered security. [FN15] Breakaway concedes that this action is a "covered class action" and that its claims are based on state law. [FN16] However, it asserts, and the Defendants dispute, that it did not allege a misrepresentation or omission of a material fact or the use of any manipulative device, that this action does not involve a "covered security," and that the conduct in question was not undertaken "in connection with" the purchase or sale of a covered security. [FN17] For the reasons that follow, I conclude that Breakaway, through the Complaint, has not alleged, within the meaning of SLUSA that any misrepresentations (or untrue statements) or omissions of material fact were made on the part of the Defendants or that any manipulative or deceptive devices were used by the Defendants. [FN18] Accordingly, this action will not be dismissed under SLUSA.

> FN15. *Zoren,* 195 F.Supp.2d at 603. It should be noted that there is a debate as to whether SLUSA even applies to suits brought by issuers against non-issuers since SLUSA's primary aim was to protect issuers

and not those otherwise involved in securities markets. *Compare Gutierrez v. Deloitte & Touche, LLP,* 147 F.Supp.2d 584, 591 (W.D.Tex.2001) ("From the language of the statute, it is possible Congress intended the SLUSA to apply only to actions brought against issuers of publicly traded stock, not accounting firms which perform audits for the issuer or intermediaries of the issuer.") *with Prager v. Knight/Trimark Group, Inc.,* 124 F.Supp.2d 229, 233 (D.N.J.2000) ("Neither the language of [the PLSRA and SLUSA] nor their legislative history indicate that they were intended to apply only to situations in which issuers of securities are accused of misrepresentation.").

> FN16. Pl. Breakaway Solutions Inc.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 20.

> FN17. The Defendants correctly note that the so-called "Delaware carve-out," 15 U.S.C. § § 77p(d)(1), 78bb(f)(3)(A), is inapplicable here because New York law governs this dispute and the case was brought in Delaware.

> FN18. Since the Defendants must meet all five prongs for SLUSA's preemptive effect to result, I decline to rule on whether the "in connection with" prong and the "covered security" prong are met.

*1. Complete Preemption Standard of Review*

**\*4** SLUSA is something of an anomaly in our federal system: within its scope, it completely preempts state law. As a general proposition, a case or controversy gains federal jurisdiction only by means of the "well-pleaded complaint" rule. That is, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." [FN19] Thus, "the plaintiff, as the master of the complaint, 'may avoid federal jurisdiction by exclusive reliance on state law.' " [FN20]

> FN19. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987).

> FN20. *McPhatter v. Sweitzer,* 2003 WL 22113455, at \*2 (M.D.N.C. Sept. 8, 2003) (quoting *Caterpillar Inc.,* 482 U.S. at 392).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
**(Cite as: 2004 WL 1949300 (Del.Ch.))**

SLUSA, as a statute which completely preempts certain securities class actions, stands as an exception to the well-pleaded complaint rule. [FN21] The complete preemption doctrine "holds that 'once an area of state law has been completely preempted, any claim purportedly based on that preempted state law is considered, from its inception, a federal law claim, and thus arises under federal law." ' [FN22] One court has described the doctrine of complete preemption:

FN21. *Zoren,* 195 F.Supp.2d at 602.

FN22. *Id.* (quoting *Caterpillar Inc.,* 482 U.S. at 393).

We read the term [complete preemption] not as a crude measure of the breadth of the preemption (in the ordinary sense) of a state law by a federal law, but rather as a description of the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal. [FN23]

FN23. *Schmeling v. NORDAM,* 97 F.3d 1336, 1342 (10th Cir.1996).

It should, however, also be noted that, "[b]ecause of the obvious federalism implications of the complete-preemption doctrine, its application has been extremely limited by the courts." [FN24]

FN24. 14B WRIGHT, MILLER, & COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3d § 3722.1, at 517. *But see Spehar v. Fuchs,* 2003 WL 23353308, at \*9 (S.D.N.Y. June 18, 2003) ("[B]ecause SLUSA was enacted in order to prevent plaintiffs from avoiding federal court, courts will interpret claims broadly in determining whether they are removable under SLUSA.").

In this case, one of the main topics of debate is whether Breakaway is actually alleging the occurrence of a fraud in the Complaint--which would be preempted--or if it is only stating an action under state law for, as an example, breach of contract--which would not be preempted. Generally, as noted above, on a Rule 12(b)(6) motion, the Court will view all the facts properly alleged in the Complaint and draw all reasonable inferences from those facts

as broadly as reasonable in favor of the survival of an action. [FN25] However, given the ease with which many breach of contract actions could be pled alternatively as fraud actions--perhaps with nothing more than a simple allegation of intent at the time of entering into the contract [FN26]-- drawing the reasonable inferences from the Complaint as expansively as possible could lead to an inference in favor of the Defendants, that a fraud claim has been alleged, and, thus, run counter to the values underlying Rule 12(b)(6).

FN25. *See, e.g., Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC,* 832 A.2d 116, 123 (Del. Ch.2003).

FN26. *See infra* note 61 and accompanying text.

On the other hand, in light of the express mandate of Congress, manifested in the terms of SLUSA, that causes of action under state law that, as alleged, amount to securities fraud claims of a certain nature be preempted, this Court cannot avoid drawing any reasonable inference of fraud that can be perceived through the allegations of the Complaint. [FN27] In other words, just as the facts and inferences cannot be drawn as narrowly as possible to favor defendants in their efforts to secure early dismissal of a complaint, neither can they be drawn as narrowly as possible as to avoid any reasonable inference of fraud occurring in connection with a sale of securities. Thus, when determining whether SLUSA has preempted the claims advanced in the Complaint, for the purposes of Rule 12(b)(6), the Court will "fairly read" [FN28] the allegations it contains and then draw necessary inferences from them.

FN27. "[C]ourts interpreting SLUSA assess preemption based upon whether the *complaint read as a whole* sets out fraudulent misconduct, regardless of the prayer for relief." *Zoren,* 195 F.Supp.2d at 604 (emphasis added).

FN28. *Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 880 (8th Cir.2002).

*2. Breakaway has not alleged any untrue statement or misrepresentation, omission of material fact, or use of any manipulative or deceptive device in its Complaint.*

a. The Express Allegations of the Complaint

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00062-GMS     Document 7-2     Filed 03/11/2005     Page 12 of 29

Not Reported in A.2d                                                          Page 6
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
**(Cite as: 2004 WL 1949300 (Del.Ch.))**

*5 The starting point for any case involving the application of a statute is the words of the statute itself. As noted earlier, SLUSA preempts suits alleging "an untrue statement or omission of a material fact" or "that the defendant used or employed any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a covered security. [FN29] Unfortunately, SLUSA provides no definition of these terms. [FN30]

> FN29. Although it has been held that "[t]he requirement of a misrepresentation or omission is satisfied 'where a plaintiff alleges a misrepresentation "concerning the value of the securities sold ... or the consideration received in return." " ' *Korsinsky,* 2002 WL 27775, at *4 (quoting *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 2001 WL 1182927, at *3 (S.D.N .Y. Oct. 9, 2001) (quoting *Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 108 (2d Cir.1986))), the defining of a misrepresentation as a "misrepresentation" does not help with the question: what is a misrepresentation in this context?

> FN30. Typically, courts implementing SLUSA have looked to the meanings ascribed to its terms elsewhere among federal securities laws. See, e.g., *French v. First Union Sec., Inc.,* 209 F.Supp.2d 818, 824 (M.D.Tenn.2002).

A brief review of the concepts involved may be helpful. For example, the "untrue statement or omission of a material fact" prong is met when false or misleading statements are alleged to have appeared in a registration or proxy statement. [FN31] Also, an affirmative pleading that a misrepresentation has occurred will satisfy this element. [FN32] " 'Manipu[lative]' is 'virtually a term of art when used in connection with securities markets.' The term refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." [FN33] Use of a "manipulative device or contrivance" has been found where there is a general business or marketing plan to engage in a deceptive activity. For example, in *Dudek v. Prudential Securities, Inc.,* [FN34] plaintiffs alleged unlawful marketing of tax-deferred annuities to accounts that already enjoyed tax-deferred status. The primary allegation was that, because the tax-deferred accounts did not need the tax benefits, the extra fees and costs the annuities entailed were a waste of the investors'

money. [FN35] In addition to noting that this set of facts would amount to a misrepresentation or omission of material facts, the court also concluded that the complaint "alleged that defendants used or employed [a] deceptive device or contrivance in connection with the purchase or sale of a covered security." ' [FN36]

> FN31. See *Gibson,* 2000 WL 777818, at *1 (misrepresentations in proxy statements); *Zoren,* 195 F.Supp.2d at 603 (involving misrepresentations and/or omissions in IPO, Secondary Public Offering, and proxy statements). See, e.g., *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."). To define materiality as "what a reasonable issuer would consider important in determining to issue shares" would be to extend the holding of *TSC Indus.* beyond its intended reach of protecting investors when they chose to purchase or sell shares. Furthermore, such a standard would mean that a failure of an underwriter to fully inform the issuer of every material fact in their dealings would be subject to SLUSA (assuming the other prongs are satisfied). Thus, such a standard would run counter to the policy concern about "convert[ing] every common-law fraud that happen[ed] to involve securities into a violation of § 10(b)" which the courts have sought to avoid when interpreting securities laws. *SEC v. Zanford,* 535 U.S. 813, 820 (2002).

> FN32. See, e.g., *Behlen v. Merrill Lynch,* 311 F.3d 1087, 1094 (11th Cir.2002) ("Behlen specifically alleged that the defendants 'negligently, recklessly or intentionally misrepresented the fact that Plaintiff and the class would be sold Class A shares,' but 'sold them more expensive Class B shares.'.... It is clear that the crux of the complaint was that the defendants either misrepresented or omitted crucial facts about the Class A and Class B shares, thus causing him and the class to invest in inappropriate securities."); *McCullagh v. Merrill Lynch & Co.,* 2002 WL 362774, at *3 (S.D.N.Y. Mar. 6, 2002) ("Plaintiffs['] ... alleg [ations] that investment recommendations that were supposed to be

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

objective were in fact motivated by Defendant's desire to boost their investment banking business" was sufficient to meet this prong of SLUSA.).

FN33. *Santa Fe Indus. v. Green,* 430 U.S. 462, 476 (1977) (citations omitted) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 (1976)). In *Santa Fe,* the Supreme Court held that use of Delaware's Short Form Merger Statute was not "manipulative" within the meaning of the securities fraud statutes. "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Id.* at 477.

FN34. 295 F.3d 875 (8th Cir.2002).

FN35. *Id.* at 878.

FN36. *Id.* at 880.

Nothing comparable to these bright line examples is alleged in the Complaint. Indeed, the Complaint is devoid of any facts or allegations that the underpricing or kickbacks were done fraudulently or as a scheme to induce Breakaway to pursue an IPO. This is not a case of a buyer of stock complaining about an inducement to buy from a misstatement or omission in a proxy. Nor is this a case where there was a fraudulent advertising or marketing scheme in relation to the sale of the securities.

First, with regard to underpricing, although it may be fraudulent or deceptive in certain instances, the Complaint does not allege that the underpricing was done fraudulently. While Breakaway does refer to underpricing as "money [left] on the table," notes that "absent underpricing ... Breakaway would have realized significantly greater proceeds from issuing its IPO," [FN37] and even asserts that the "additional compensation was effectively 'paid' by the IPO issuers in that the source of this additional compensation was the underpricing of these IPOs in the first place," [FN38] it never directly states that it was harmed by the underpricing itself, that the underpricing was wrongfully done, or asks for underpricing as a measure of damages. In fact,

Breakaway observes that "other factors may contribute in determining the amount" at which the IPO shares issued [FN39] and argues in its brief that "there may have been--and may still be--many reasons for underpricing that are beneficial to issuers." [FN40]

FN37. Am. Compl. ¶ 23.

FN38. *Id.* ¶ 27.

FN39. *Id.* ¶ 23.

FN40. Pl. Breakaway Solutions Inc. Mem. of Law at 4.

**\*6** Second, the "kickbacks," as alleged, cannot be seen as any kind of manipulative device that had an artificial effect on market activity. Breakaway's claim is merely that the additional payments (or other compensation) constituted a breach of contract (or other duty imposed by state law)--the Defendants contracted to sell at $14 per share and sold at a higher price. Indeed, the almost insatiable demand for technology stocks, such as Breakaway's, was well known during this stock market "bubble" and the Defendants' selling of shares to favored clients is not alleged to have increased or decreased materially the demand for the stock.

With regard to omission of a material fact, Breakaway has alleged that it "could not, in the exercise of reasonable diligence, have uncovered Defendants' wrongful conduct." [FN41] Knowledge that the Underwriters were going to receive kickbacks might have been important to Breakaway in choosing to close its deal with them and to issue its stock and, thus, was at least in one sense material. However, contrary to the Defendants' arguments, the mere fact that something was not disclosed does not make it an "omission of a material fact" within the meaning of SLUSA. [FN42] Ascertaining the scope of this concept in the context of the issuer-underwriter relationship is something of a difficult endeavor because most cases applying SLUSA have had investors as one set of parties.

FN41. Am. Compl. ¶ 61. The "wrongful" conduct grew from the Underwriters' relationships with their "favored customers." Breakaway does not allege, directly or indirectly, that the first day run-up in the price of its stock came as a surprise.

FN42. The word "kickback" carries

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

unsavory connotations. Breakaway chose to use it and it, in part, defines the substance of Breakaway's allegations.

Although the Defendants did not disclose to Breakaway the "fact" of additional compensation from "favored" clients, Breakaway has not alleged that the Defendants were under any obligation to make such a disclosure. Thus, by reference to the allegations advanced by Breakaway, there is no basis for concluding that Breakaway has alleged a material omission.

Finally, Breakaway has not directly alleged any "untrue statement" or misrepresentation made by the Defendants. Accordingly, the Complaint, by its express allegations, is not preempted by SLUSA. [FN43]

> FN43. In reaching this conclusion, I have looked to *Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.,* 2004 WL 435058 (S.D.N.Y. Mar. 9, 2004) and *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,* 216 F.Supp.2d 251 (S.D.N.Y.2002), both of which considered the application of SLUSA to allegations comparable to those set forth in the Complaint. Although *Xpedior* questions a portion of the analysis underlying *MDCM* (especially its reluctance to look beyond the express allegations of the complaint), it firmly reconfirms the conclusion that SLUSA does not preempt state law claims based on the facts asserted here.

b. Behind the Complaint

The Defendants correctly point out that overt claims of misrepresentation, omission, or deception are not necessary for SLUSA to apply--that courts are required to "look behind the labels" to the nature, essence, substance, or gravamen of what is alleged in order to determine whether preemption has occurred. [FN44] SLUSA preempts certain types of securities fraud claims, and two competing considerations are at work. First, not every breach of contract (or even every fraud) involving securities is within the scope of SLUSA. Second, for example, if the claim "sounds in fraud" and the pleadings otherwise meet the standards set by SLUSA, careful and creative drafting will not be sufficient to avoid SLUSA. The gap is largely one of inference; for if the reasonable inference from the facts alleged in the complaint is that fraud occurred, the plaintiffs' express

protestations to the contrary, however they may be splattered across the complaint, will not allow for an escape from SLUSA's reach.

> FN44. This is because, when Congress intends "complete preemption," that overcomes the well-pleaded complaint rule and deprives the plaintiff of his status as "master of the claim." *See, e.g., Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 123-24 (2d Cir.2003); *Zoren,* 195 F.Supp.2d at 602.

*7 One test that courts have used in making this determination is the "necessary component" test, under which:

> [A] court must determine whether the state law claim relies on misstatements or omissions as a 'necessary component' of the claim. In this context, 'necessary component' encompasses both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged. Thus, under the necessary component test, a complaint is preempted under SLUSA only when it asserts (1) an explicit claim of fraud (*e.g.,* common law fraud or fraudulent inducement), or (2) other garden-variety state law claims that 'sound in fraud.' But SLUSA does not preempt claims 'which do not have as a necessary component misrepresentation[s], untrue statements, or omissions of material facts' made in connection with the purchase or sale of a security. [FN45]

> FN45. *Xpedior,* 2004 WL 435058, at *4 (footnotes omitted) (quoting *McEachern v. Equitable Life Assur. Soc. of the U.S.,* 2001 WL 747320, at *2 (N.D. Ala. June 15, 2001)).

This test's basic inquiry is whether the plaintiff is pleading fraud in words or substance. [FN46] It does not, however, allow for claims that are not pled to be read into the complaint to find preemption as the "plaintiff is ordinarily free to choose the legal theories upon which she relies and to discard others." [FN47]

> FN46. *Id.* at *5-*6.

> FN47. *Id.* at *6.

Most of the cases applying the necessary component test have found preemption because the complaint contained counts which alleged fraud or misrepresentation which tainted subsequent counts in the complaint. [FN48] For instance, in *Hines v. ESC*

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
**(Cite as: 2004 WL 1949300 (Del.Ch.))**

Page 9

*Strategic Funds, Inc.,* [FN49] the plaintiffs brought claims based on state securities fraud, common law fraud, breach of fiduciary duty, and breach of implied contract. While the court found the third claim was not preempted because the "in connection with" requirement was not met, it concluded that the other three were preempted under SLUSA. The court relied on the complaint's allegations of a fraudulent scheme in the first two counts; the fourth count recited representations made to the plaintiffs that were described in the first two counts as having been fraudulent. Thus, the fourth count, although alleging a breach of an implied covenant claim, sounded in fraud. Similarly, in *In re Livent, Inc. Noteholders Securities Litigation,* [FN50] three of the plaintiffs' four state law claims--for fraud, negligence, and negligent misrepresentation--explicitly alleged fraud and were found preempted. The fourth claim for tortious interference with contract was also found preempted because the plaintiffs alleged a manipulative device or contrivance by alleging that "all the defendants *schemed* to demote and suspend [certain employees] rather than discharge them." [FN51]

> FN48. Similarly, a majority of the cases which purport to "look behind the complaint" to find preemption, but did not apply the necessary component test, also dealt with specific allegations of fraud, misrepresentation or the like. *See, e.g.,* *Behlen,* 311 F.3d at 1094 ("Behlen specifically alleged that the defendants 'negligently, recklessly or intentionally misrepresented the fact that Plaintiff and the class would be sold Class A shares' ... 'suppressed the true facts concerning the repeated sales ... and concealed and suppressed the illegality of their conduct."'); *McCullagh,* 2002 WL 362774, at *6 (alleging "misrepresentation regarding the quality of investment advice ... [plaintiffs] receiv[ed] advice tainted by a company policy requiring employees to issue 'buy' recommendations"); *Korsinsky,* 2002 WL 27775, at *1, *4 (Complaint "outline[d] several instances of alleged misrepresentations made by SSB and Grubman with regard to the value of AT & T."); *Prager,* 124 F.Supp.2d at 234-35 (Plaintiff alleged that "[defendant] falsely stated in various public filings that it guaranteed to execute retail customers' trades" and "alleged ... false and misleading statements").

> FN49. 1999 WL 1705503 (M.D.Tenn. Sept. 17, 1999).

> FN50. 151 F.Supp.2d 371 (S.D.N.Y.2001).

> FN51. *Id.* at 443.

By contrast, the complaint in *Xpedior,* similar to the one in this action, contained no such allegations and was found not to have been preempted. In that case, the court observed that a claim "sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim," [FN52] and that, since none of Xpedior's allegations sounded in fraud, there was no SLUSA preemption. The court found that no "untrue statements or omissions" were alleged with regard to the kickbacks and side agreements (the same conduct as alleged here) because

> FN52. *Xpedior,* 2004 WL 435058, at *6.

**8** Xpedior alleges only that DLJ [the defendant underwriter] acted contrary to its express and implied duties. That DLJ might, in fact, never have intended to perform under the terms of the contract is irrelevant; that is not what Xpedior is alleging. Xpedior's claims require no evidence of DLJ's mental state at all, nor has Xpedior made any allegations about DLJ's mental state at the time that the parties entered into the underwriting contract. [FN53]

> FN53. *Id.* at *7.

Similarly, the court found no use of a manipulative or deceptive device because, "[a]lthough the conduct as alleged may (or may not) constitute manipulation if brought in a securities fraud lawsuit, that is not what Xpedior alleges in its Complaint." [FN54] Finally, the court noted that "it [was] unnecessary for Xpedior to prove that DLJ manipulated the market in order to prevail on its contract claim, as pleaded." [FN55]

> FN54. *Id.*

> FN55. *Id.*

The Defendants claim that the Complaint is preempted by SLUSA because "it is clear that the alleged conduct Breakaway challenges hinges on material omissions, deception or manipulation by which defendants exploited 'underpriced' IPO

securities and secret 'side agreements' to take compensation that should have belonged to the issuers." [FN56] To put it another way, "[b]ecause Breakaway's claim is based on the notion that Defendants deceived Breakaway in negotiations over the price of its IPO stock, or failed to disclose the existence of supposed side agreements by which Defendants would enrich themselves at the expense of Breakaway, this case is based on alleged conduct that is SLUSA preempted." [FN57] I reject this argument because, especially in light of the standards for assessing a Rule 12(b)(6) motion, it necessarily reads facts into the Complaint which are not present. In other words, the allegations of the Complaint do not sound in fraud.

> FN56. Defs.' Mem. in Supp. of Mot. to Dismiss at 23.

> FN57. Defs.' Reply Br. in Further Supp. of Mot. to Dismiss at 8.

The Court's charge at this stage of the proceedings is to interpret the Complaint as written, not as it might have been written. [FN58] The substance of Breakaway's Complaint is that the Defendants contracted to do one thing--sell at $14.00 a share-- and did something else--sold for a higher value. That the shares were underpriced makes this claim possible. After all, no kickbacks could be received on shares that were priced at value if one presumes that no rational investor would pay more than that for them . [FN59] However, Breakaway does not allege that this underpricing was deceptive. Instead, it alleges that the Defendants "[took] advantage of and accept[ed] as their own the benefits from the underpricing through the [kickbacks]" [FN60] and profit sharing. Drawing the factual inferences as one must at this stage, it can be inferred that underpricing, in and of itself, could have been beneficial or helpful to Breakaway. In short, the "underpricing" itself, based on the allegations of the Complaint, was not the result of the Underwriters' efforts to develop the opportunity to capture a portion of the differential which would result from the underpricing.

> FN58. "While plaintiffs may not avoid SLUSA pre-emption simply by artful pleading that avoids the actual words 'misrepresentation' or 'fraud,' neither may defendants avoid every possible claim by recasting any lawsuit in which a securities broker is a defendant into a securities fraud action." *Norman v. Salomon Smith Barney, Inc.,* 2004 WL 1287310, at *3 (S.D.N.Y.

June 9, 2004).

> FN59. The relevance or accuracy of this presumption at the time when Breakaway issued its shares may easily be doubted.

> FN60. Am. Compl. ¶ 49.

*9 Similarly, the Defendants' argument that SLUSA bars these claims because they rest on the existence of "secret side agreements" with regard to their reselling of the shares for more than the amount set by the Agreement reads too much into the Complaint. " 'The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not become fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." ' [FN61] At least in the typical case, when the question is whether the defendant intended to perform under the agreement, the conduct in which the defendant subsequently engages is easily recognized as a breach of the contractual undertaking. Here, the Underwriters agreed to sell the Breakaway shares at $14 and turn over to Breakaway $13.02 for each share sold. That they did. For an intent not to perform under a contract to be fraudulent, the conduct must be readily perceived as a breach at the time of entry into the contract. Otherwise, if two parties entered into a contract with different subjective understandings and a dispute arose when each acted in accordance with its subjective understanding, the party who loses on the proper interpretation of the contract would be deemed to have perpetrated a fraud--obviously, an unreasonable conclusion. This distinction demonstrates the fundamental difference between breach of contract and fraud and, ultimately, provides the basis for the Court's denial of the Defendants' motion to dismiss because of preemption under SLUSA. Thus, drawing the inferences as required, I am satisfied that the failure to disclose the "secret side agreements" was not an "omission" that can be found "behind the Complaint" and within the meaning of SLUSA. Instead, the Complaint speaks solely of a dispute related to performance of duties imposed by the Agreement and state law that has not been preempted by SLUSA.

> FN61. *Gurary v. Winehouse,* 190 F.3d 37, 44 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993)). There is no dispute that the Defendants had the capacity to perform the agreement in accordance with its terms.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

Finally, Breakaway's initial complaint should also be mentioned. In *Dudek,* the court found SLUSA preemption, in part by relying on earlier versions of the complaint. When the plaintiffs there first filed their complaint, they alleged nine state causes of action which included explicit claims of fraud. They voluntarily dismissed that complaint and filed a new complaint from which it deleted "the allegations of fraud, misrepresentation, and non-disclosure that permeated their [first] complaint." [FN62] The court found preemption because, even after the deletions, "the essence of both complaints is the unlawful marketing of tax-deferred annuities, either by misrepresenting their suitability for tax-deferred retirement plans, or by failing to disclose their unsuitability for such accounts. In substance, both complaints allege that defendants misstated or omitted material facts in connection with the purchase and sale of tax-deferred annuities." [FN63] The court also noted that the new complaint "fairly read ... allege[d] that defendants 'used or employed a deceptive device or contrivance in connection with the purchase or sale of a covered security." ' [FN64]

FN62. *Dudek,* 295 F.3d at 879.

FN63. *Id.* at 880.

FN64. *Id.*

*10  In addition, *Xpedior* acknowledges that the approach of comparing a prior complaint to the pending one "may have merit in those instances where there was a prior complaint, and the later complaint alleged identical facts but different theories in a transparent attempt to avoid preemption." [FN65] This, however, does not mean that simply because a prior complaint would have been preempted the pending complaint must be preempted as well. While Breakaway's initial complaint in this matter may have been preempted because it may have stated a cause of action for intentional underpricing, and perhaps could have been read to allege that the underpricing was done fraudulently, those allegations are not in the Complaint. Indeed, absent those allegations, there is a different factual background to interpret and, unlike *Dudek,* there are no longer any express allegations of fraud remaining in the Complaint that can be fairly read as implicating SLUSA. To sanction Breakaway for the previous version of its complaint would be to ignore the rules of this Court which provide that "leave [to amend] shall be freely given." [FN66] Although a previous version of a complaint may, in

the appropriate circumstances, help to interpret a new version if the key factual allegations remain the same, here, where the new complaint contains different allegations from those which may have called for preemption, there is no longer any cause to focus on the previous allegations.

FN65. *Xpedior,* 2004 WL 435058, at *6.

FN66. Del. Ct. Ch. R. 15(a).

Because Breakaway has not alleged "misrepresentation or omission of a material fact" or the use of a "manipulative or deceptive device," the state law claims asserted in this action have not been preempted by SLUSA, and the Defendants are not entitled to dismissal under SLUSA. [FN67]

FN67. The Court's determination that the Complaint survives SLUSA should not be perceived as excluding SLUSA's presence from this proceeding. During the course of litigation, as facts are developed and legal theories are refined, the substance of the litigation evolves. The allegations in this case come close to the line drawn by SLUSA; this case may not evolve in a manner that crosses that line.

C. *The State Law Claims*

With the conclusion that Breakaway's state law claims have not been preempted by SLUSA, the Court must now consider those state law claims and determine whether they survive analysis under Rule 12(b)(6). Although it is necessary to evaluate each of Breakaway's state law claims separately, the Court's analysis will be guided by *EBC I, Inc. v. Goldman Sachs & Co.,* [FN68] and a brief overview of that opinion may be helpful. The claims under New York law that were raised in *EBC I* are, in many ways, similar to the claims before this Court.

FN68. 777 N.Y.S.2d 440 (N.Y.App.Div.2004).

The complaint [in *EBC I* ] alleges that defendant underpriced plaintiff's shares in order to reap an additional profit, beyond the amount realized on the spread between the price of its own subscription and the higher public offering price, when it "flipped" its shares in the balloon-priced aftermarket, and that such underpricing was also the consideration given for "kickbacks" from defendant's favored customers, to whom defendant

Not Reported in A.2d                                                    Page 12
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

had allocated shares in the IPO that were also flipped in the aftermarket, disguised as commissions on unrelated transactions. [FN69]

FN69. *Id.* at 442-43.

Thus, the core of the allegations in *EBC I* is the same as in this action except that, in *EBC I,* it was alleged that the underwriters underpriced the initial offering in order to create the opportunity to take advantage of the post-issuance jump in share price. The court in *EBC I* concluded that the plaintiff had adequately alleged, under New York law, claims for a breach of fiduciary duty, for breach of the implied covenant of good faith and fair dealing, and for unjust enrichment.

1. *Breach of Contract*

*11 The Agreement provides, in pertinent part:
    2. Agreement to Sell and Purchase. The Company hereby agrees to sell to the several Underwriters, and each Underwriter ... agrees ... to purchase from the Company [shares of Breakaway] at $ 13.02 a share (the "Purchase Price").
    3. Terms of Public Offering. The Company is advised by you that the Underwriters propose to make a public offering of their respective portions of the Shares as soon after the Registration Statement and this Agreement have become effective as in your judgment is advisable. The Company is further advised by you that the Shares are to be offered to the public initially at $14.00 a share (the "Public Offering Price") ...

Breakaway does not contend that the Defendants breached paragraph 2 of the Agreement; Breakaway, in fact, was paid $13.02 per share. Breakaway does, however, charge the Defendants with failing to comply with the terms of paragraph 3. Count I of the Complaint alleges that the Defendants breached the Agreement by (1) not selling to the public, and (2) not selling at the agreed upon price of $14 per share.

"The essential elements to pleading a breach of contract under New York law are the making of an agreement, performance by the plaintiff, breach by the defendant, and damages suffered by the plaintiff." [FN70] To survive a motion to dismiss, the plaintiff must identify which provisions or terms of the contract were breached by the conduct at issue. [FN71]

FN70. *Startech, Inc. v. VSA Arts,* 126 F.Supp.2d 234, 236 (S.D.N.Y.2002).

FN71. *Wolff v. Rare Medium, Inc.,* 171 F.Supp.2d 354, 358 (S.D.N.Y.2001).

The Defendants argue that Breakaway has not identified a specific provision of the Agreement that has been breached. The Complaint alleges:
    ¶ ¶ 2 and 3 of Plaintiff's underwriting agreement with Defendants established a fixed amount of compensation Defendants were to receive in connection with Plaintiff's IPO by setting forth the underwriting spread. In particular, ¶ 2 of the parties' underwriting agreement provided the per share price at which Defendants would acquire the IPO shares from Plaintiff, and ¶ 3 of the parties' underwriting agreement provided the per share price at which Defendants would resell Plaintiffs IPO shares to the public, with the difference being the underwriting compensation. [FN72]

FN72. Am. Compl. ¶ 33.

Breakaway asserts that its shares were not sold "to the public" because they were sold to favored investors. The interpretation of this term which Breakaway advances is inconsistent with the broadly held understanding that the phrase "public offering" simply refers to an offering that is not exempt from the federal securities laws. [FN73] To hold that all or a certain percentage of an IPO must be sold to the populace in general (or any particular subset thereof) would be inconsistent with the use of the term "public" in the Agreement. [FN74] Thus, to the extent that Breakaway is alleging its shares were not sold "to the public" because they were sold to favored clients of the Defendants, the motion to dismiss is granted.

FN73. *See, e.g., SEC v. Ralston Purina Co.,* 346 U.S. 119, 123-24 (1954). "In its broadest meaning the term "public" distinguishes the populace at large from groups of individual members of the public segregated because of some common interest or characteristic. Yet, such a distinction is inadequate for practical purposes; manifestly, an offering of securities to all redheaded men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less "public," in every realistic sense of the word, than an unrestricted offering to the world at large. Such an offering, though not open to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

everyone who may choose to apply, is nonetheless "public" in character, for the means used to select the particular individuals to whom the offering is to be made bear no sensible relation to the purposes for which selection is made." ' *Id.* (quoting *SEC v. Sunbeam Gold Mines Co., 95 F.2d 699, 701 (9th Cir.1938)*).

FN74. One can argue that the Agreement's use of the word "public" creates an ambiguity that may allow for consideration of extrinsic evidence, that the Court has looked to extrinsic evidence to give meaning to the term public, that the extrinsic evidence is not in the Complaint and, thus, that the Court should not have garnered the meaning of public in this fashion at this stage. The Complaint makes clear that the Agreement was drafted and negotiated for performance within the federal securities regulatory system. In that venue, the term "public" has a well-known meaning, reflected in the case law, and that meaning can reasonably be viewed, even for purposes of a motion to dismiss, as an integral part of the understanding reached by the parties.

The second aspect of Breakaway's breach of contract claim arises from its allegation that the Defendants received something more than $14 for each share of Breakaway. The Agreement, according to Breakaway, required the Underwriters to sell at $14 per share, not higher and not lower. The Defendants agreed to handle Breakaway's IPO for the spread of $0.98 (the difference between the $14 offering price and the $13.02 paid to Breakaway). By obtaining more than the agreed upon spread of $0.98 per share, the Defendants, in Breakaway's view, breached the Agreement.

*12 Breakaway concedes that the underpricing did not breach the Agreement and that it asserts no claim for underpricing. [FN75] Instead, it argues that the sale of its shares at more than $14 (that is, $14 plus the benefits received by the Defendants from their favored clients) failed to meet the specific sale price set by the Agreement. [FN76] In substance, Breakaway argues that, while the underpricing is unobjectionable, the Defendants were precluded by contract from benefiting from it. For purposes of a motion to dismiss, Breakaway has sufficiently alleged a breach of the Agreement. It may well be, when the record is more fully developed, that Breakaway's interpretation of the Agreement is

untenable, but that cannot be resolved at this stage of the proceedings. [FN77] Accordingly, that portion of Count I alleging that the Defendants breached their contractual obligations to sell Breakaway's shares at $14 each survives the Defendants' efforts under Rule 12(b)(6).

FN75. "[N]owhere in the Complaint does Breakaway allege ... that underpricing ... itself breached the contract." Pl. Breakaway Solutions, Inc.'s Memo of Law at 4.

FN76. The Agreement contains no express prohibition on sales at an effective price in excess of $14 per share.

FN77. Under New York law, in order to prove a claim for breach of contract, proof of damages is essential. *See, e.g., Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc., 241 F.Supp.2d 246, 260 (S.D.N.Y.2002)*. Because Breakaway does not challenge the underpricing, the proper measure for contract damage is not clear. In the context of a motion to dismiss, however, it is enough that Breakaway has alleged that the Defendants were paid in excess of what they were allowed under the Agreement.

*2. Breach of the Covenant of Good Faith and Fair Dealing*

Count II of the Complaint asserts that the Defendants breached the implied covenant of good faith and fair dealing by "benefiting from Breakaway's underpriced IPO securities, by allocating Breakaway's undervalued shares to favored clients, and by directly or indirectly requiring and receiving additional compensation therefrom." [FN78] The Defendants have argued that because Breakaway received all the monetary compensation called for in the Agreement, it received the full benefit of its bargain and this Count should be dismissed.

FN78. Am. Compl. ¶ 45.

The covenant of good faith and fair dealing is implied in every contract under New York law. [FN79] "The implied obligation encompasses 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.' " [FN80] This covenant is breached when "one party seeks to prevent the contract's performance or to withhold its benefits." [FN81] This covenant assures " 'that neither party shall do

Case 1:05-cv-00062-GMS    Document 7-2    Filed 03/11/2005    Page 20 of 29

Not Reported in A.2d                                                                                  Page 14
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
**(Cite as: 2004 WL 1949300 (Del.Ch.))**

anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." ' [FN82] It "arises only to control how the parties carry out the rights and duties they have undertaken under the contract" [FN83] and "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." [FN84]

> FN79. *See, e.g., Smith v. Gen. Acc. Ins. Co.,* 697 N.E.2d 168, 170 (N.Y.1998).

> FN80. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 20 (Del.2001) (quoting *Dalton v. Educ. Testing Serv.,* 663 N.E.2d 289, 291 (N.Y.1995)) (applying New York law).

> FN81. *Metro. Life Ins. Co. v. R.J.R. Nabisco, Inc.,* 716 F.Supp. 1504, 1517, (S.D.N.Y.1989).

> FN82. *Dalton,* 663 N.E.2d at 291 (quoting *Kirke LaShelle Co. v. Paul Armstrong Co.,* 188 N.E. 163, 167 (N.Y.1933)).

> FN83. *Warner Theatre Assocs. LP v. Metro. Life Ins. Co.,* 1997 WL 685334, at *6 (S.D.N.Y. Nov. 4, 1997).

> FN84. *Wolff,* 171 F.Supp.2d at 359. It may be that the heart of Breakaway's claim lies closer to the implied covenant of good faith and fair dealing than it does to a precisely-defined and enforceable contractual right.

The Defendants argue that "the sum total" of Breakaway's entitlement under the Agreement was $13.02 a share, which it received, and therefore there was no breach of any implied covenant. However, whether the Defendants "frustrate[ed] the overarching purpose of the offering" [FN85] by taking advantage of their position to control how the Agreement was implemented presents a fact-based inquiry that is not well suited for a motion to dismiss. Breakaway's allegations are sufficient to withstand a motion to dismiss its claim that the implied covenant of good faith and fair dealing was breached.

> FN85. *EBC I,* 777 N.Y.S.2d at 443.

### 3. Breach of Fiduciary Duty

**\*13** Count III of the Complaint purports to state a claim for breach of fiduciary duty. It alleges the Defendants, as underwriters, "were fiduciaries of

Breakaway," [FN86] "owed Plaintiff ... duties of loyalty, due care and fair dealing," [FN87] and "violated their fiduciary duties ... by virtue of their taking advantage of and accepting as their own the benefits from the underpricing through the allocation and profit sharing practices alleged herein, and by placing their own financial interests and those of its investor clients above those of its IPO issuer clients." [FN88]

> FN86. Am. Compl. ¶ 48.

> FN87. *Id.* ¶ 49.

> FN88. *Id.* ¶ 50.

Under New York law, where a contract controls the parties' dealings, such a claim can only exist where " 'a legal duty independent of the contract itself has been violated" ' and this duty " 'spring[s] from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." ' [FN89] "[T]he focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement." [FN90]

> FN89. *Bristol-Myers Squibb Indus. Div. v. Delta Star, Inc.,* 620 N.Y.S.2d 196, 197 (N.Y.App.Div.1994) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 516 N.E.2d 190, 193--94 (N.Y.1987)) (citations omitted).

> FN90. *Apple Records, Inc. v. Capital Records, Inc.,* 529 N.Y.S.2d 279, 282 (N.Y.App.Div.1988).

A fiduciary duty is an example of a duty which "must be separate and beyond any contractual duties." [FN91] "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." [FN92] Furthermore, it has been held that, at least in certain circumstances, "the positions of the underwriter and the [company] are adverse." [FN93] However, the underwriter is a fiduciary of a corporation when it comes to the use of inside information learned about that company for the underwriter's own personal benefit. [FN94]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
**(Cite as: 2004 WL 1949300 (Del.Ch.))**

FN91. *Global Entm't, Inc. v. N.Y. Tel. Co.,* 2000 WL 1672327, at * 6 (S.D.N.Y. Nov. 6, 2000).

FN92. *WIT Holding Corp. v. Klein,* 724 N.Y.S.2d 66, 68 (N.Y.App.Div.2001) (citations omitted). *See also Global Entm't,* 2000 WL 1672327, at *6.

FN93. *Escott v. BarChris Constr. Comp.,* 283 F.Supp. 643, 696 (S . D.N.Y 1968) (underwriters and company's officers are adverse with respect to the truth of the prospectus).

FN94. *See, e.g., Frigitemp Corp. v. Fin. Dynamics Fund, Inc.,* 524 F.2d 275, 279 (2d Cir.1975); *Dirks v. SEC,* 463 U.S. 646, 655 n. 14 (1983).

Whether or not an underwriter in a firm-commitment underwriting agreement is a fiduciary as a matter of New York Law with respect to the manner in which the shares are sold to the public has been subject to debate. [FN95] However, all that is required for purposes of surviving a motion to dismiss are "allegations showing a pre-existing relationship between plaintiff and defendant that justified the alleged trust the former placed in the latter in setting the price of its shares." [FN96] Indeed, the argument that "the alleged fiduciary relationship [between underwriters and issuers] is necessarily negated by the limited statement of [the underwriter's] agency status vis-a-vis other underwriters contained in the prospectus," has recently been rejected. [FN97] Thus, Breakaway has sufficiently alleged a fiduciary relationship with its description of its relationship with the Defendants. In the context of a fiduciary relationship, the Court cannot conclude that Breakaway would be able under no set of facts that it could prove to demonstrate that the Defendants took undue advantage of that relationship for their advantage. Accordingly, the Defendants' motions to dismiss Count III of the Complaint are denied.

FN95. *See, e.g., Blue Grass Partners v. Bruns, Nordeman, Rea & Co.,* 428 N.Y.S.2d 254, 255 (N.Y.App.Div.1980) (noting, but not reaching, the trial court's determination that "an underwriter, in a best efforts underwriting, owes no fiduciary duty to an issuer" with regard to selling the assets it acquired from the issuer to the public).

FN96. *EBC I, Inc.,* 777 N.Y.S.2d at 443.

FN97. *Id.*

4. *Unjust Enrichment*

*14 In Count V of the Complaint, Breakaway alleges that the Defendants were unjustly enriched by their allocation practices and, thus, should be required to pay those profits over to it, as an alternative to its breach of contract claim in Count I. The Defendants have moved to dismiss by arguing that the allegations necessary to support an unjust enrichment claim have not been set forth.

The elements of an unjust enrichment claim under New York law are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant did not adequately compensate plaintiff for the benefit; and (3) it would be inequitable for defendants to retain the benefit . [FN98] Breakaway has pled that: (1) it "conferred benefits upon Defendants in the form of compensation for underwriting [its] IPO;" [FN99] (2) the "Defendants took advantage of and used for their own benefit the underpriced IPOs issued by Plaintiff ... by obtaining direct and indirect compensation therefrom at the expense of Plaintiff;" [FN100] and (3) "[t]hrough their inequitable conduct, the Defendants obtained excessive underwriting and other compensation [which] would be inequitable for Defendants to retain." [FN101] At this stage of the proceedings, this pleading is sufficient. Drawing the inferences as the Court must, the Complaint states a claim that Breakaway suffered as a result of the sale of its stock to the public at a higher than agreed upon price and that this resulted in an unjust benefit for the Defendants.

FN98. *See Smith v. Chase Manhattan Bank,* 741 N.Y.S.2d 100, 102-- 103 (N.Y.App.Div.2002).

FN99. Am. Compl. ¶ 60.

FN100. *Id.* ¶ 61.

FN101. *Id.* ¶ 62.

More importantly, an **unjust enrichment** claim is not to be dismissed because it is pled in the alternative to the breach of **contract** claim. While " 'the existence of a valid and enforceable written **contract** governing a particular subject matter ordinarily precludes recovery in quasi **contract** for events arising out of the same subject matter," ' [FN102] there are situations where **alternative**

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

Page 16

pleading is allowed under both theories. [FN103] "This is generally so, however, only when there is doubt as to the enforceability or meaning of the terms of the **contract** in question." [FN104] Although the Agreement primarily governs the relationship between the parties, the Defendants have argued that its terms are in dispute with respect to the excess or additional compensation. For instance, the Defendants have argued:

> FN102. *Rossdeutscher, 768 A.2d at 23* (quoting *Clark-Fitzpatrick, Inc., 516 N.E.2d at 193*) (applying New York law).

> FN103. *Id. See also Stenberg, Inc. v. Walber 36th St. Assocs., 594 N.Y.S.2d 144, 145 (N.Y.App.Div.1993)* ("[It] has never been New York law" that "a claim in contract and one in quasi contract are mutually exclusive in all events and under all circumstances.").

> FN104. *Rossdeutscher, 768 A.2d at 23. See also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996)* ("Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between those theories; he is entitled to have the case submitted to the jury on both counts .").

[S]ections 2 and 3 of the Underwriting Agreement ... set no "cap" on the amount of money the underwriters were 'allowed' to earn from Breakaway's initial public offering. Indeed, the Agreement does not even contain a specific provision specifying defendants' compensation. To be sure, the contract makes clear that the underwriters might earn $0.98 per share on Breakaway's stock, because it recites the price at which Breakaway agreed to sell shares to the underwriters (*i.e.,* $13.02) and identified the price at which the underwriters advised Breakaway they proposed to offer shares to the public (*i.e.,* $14.00). But nothing in the Agreement prohibits the underwriters from earning more than $0.98 per share for allocation by receiving payments from other sources, even assuming that such payments actually took place. [FN105]

> FN105. Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 8 (internal citations omitted).

*15 Perhaps the better interpretation of the Agreement is that the Underwriters are limited in the amount which they could receive for the shares sold; perhaps, the Defendants will be able to demonstrate that the Agreement did not address and, therefore, did not resolve the question of whether the Defendants could also profit from their relationships with their "favored clients" as well. Under New York law in this context, it is enough that the Defendants are alleged to have received, at Breakaway's expense, benefits to which they were not entitled within the context of the relationship that Breakaway had with the Defendants. [FN106] For this reason, this Count cannot now be dismissed.

> FN106. Any argument that Breakaway has no claim for unjust enrichment because the "kickbacks" were paid by its clients, and not by Breakaway, fails in light of *EBC I.* That New York law apparently does not necessarily require that the enrichment be *at the expense* of the plaintiff distinguishes *Xpedior* which dismissed the claim there for unjust enrichment.

### 5. *Indemnification*

In Count IV, Breakaway makes a claim for indemnification or contribution against the Defendants based on a series of cases in which shareholders filed suit against issuers, such as Breakaway; the cases have been consolidated as *In re IPO Securities Litigation* [FN107] in the Southern District of New York. Breakaway alleges that its underwriting agreement contained a provision for indemnification, as did those of every issuer in the class, and that

> FN107. No. 21 MC 92(SAS). One of the cases consolidated was *Longman v. Breakaway Solutions, Inc.,* 01 Civ. 6995 (S.D.N.Y). The Court has been informed that, once lead counsel and lead plaintiff were chosen for *In re IPO Securities Litigation,* they decided not to press claims against Breakaway and it appears that it is no longer named as a defendant. This, however, is a factual matter beyond the Complaint.

[T]he Defendants should be required to indemnify and hold harmless Plaintiff Breakaway and other members of the Subclass from the claims of the plaintiff shareholders asserted in *In re Initial Public Offering Securities Litigation* to the full

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507
(Cite as: 2004 WL 1949300 (Del.Ch.))

extent available, including without limitation for any judgments which may be entered against Breakaway and related persons and for attorney fees and related costs in connection therewith. To the extent such indemnification is for any reason unavailable, then the Defendants should be required to provide contribution to Plaintiff and the other members of the Subclass as set forth in the parties' underwriting agreements. [FN108]

FN108. Am. Compl. ¶ 56.

As this Count is not ripe for adjudication at this time, it is dismissed without prejudice.

As a general matter, indemnification claims do not accrue "until the party seeking indemnification has made payment to the injured person." [FN109] However, "[d]eparture from this general rule may be warranted where the interests of justice and judicial economy so dictate." [FN110] Typical examples supporting such departure are where indemnification is asserted in a third party action [FN111] or where the court has "all the information [needed] to adjudicate [the] demands for indemnification." [FN112]

FN109. *McDermott v. New York*, 406 N.E.2d 460, 461 (N.Y.1980).

FN110. *New York v. Syracuse Rigging Co.*, 671 N.Y.S.2d 801, 802 (N.Y.App.Div.1998).

FN111. *Harris v. Rivera*, 921 F.Supp. 1058, 1062 (S.D.N.Y.1995).

FN112. *Muller v. Walt Disney Prods.*, 876 F.Supp. 502, 505 (S.D.N.Y.1994).

In this case, there is no reason to depart from the general rule. [FN113] The indemnification provision of the Agreement provides as follows:

FN113. Because Breakaway has been threatened with suit and, at least at one time, was a party at risk in the litigation, it has standing (except to the extent that the concepts of ripeness and standing may overlap) to pursue this claim. Whether Breakaway would be an appropriate class representative is a different question.

Each Underwriter agrees, severally and not jointly, to indemnify and hold harmless the Company ...

but only with reference to information relating to such Underwriter furnished to the Company in writing by such Underwriter through you expressly for use in the Registration Statement, any preliminary prospectus, the Prospectus or any amendments or supplements thereto.

*16 The Agreement also requires Breakaway to indemnify and hold harmless each Underwriter ... from and against any and all losses, claims, damages and liabilities ... caused by any untrue statement or alleged untrue statement of material fact contained in the Registration Statement ... [,] preliminary prospectus or the Prospectus ..., or caused by any omission or alleged omission to state therein a material fact required to be stated therein....

Thus, whether or not Breakaway and the class are entitled to indemnification depends on specific facts and an interpretation of comparable clauses in the various underwriting agreements. The underlying facts are currently being litigated in *In re IPO Securities Litigation*. No "judicial economy" would be achieved in this different forum from considering Breakaway's request at this time. For this reason, the Defendants' motions to dismiss are granted, without prejudice, with respect to Count IV.

IV. CONCLUSION

For the foregoing reasons, Count I of the Complaint is dismissed to the extent that it alleges that the Defendants breached the Agreement by failing to make a "public offering." Count IV of the Complaint is dismissed, without prejudice. Otherwise, the Defendants' motions to dismiss are denied.

IT IS SO ORDERED.

2004 WL 1949300 (Del.Ch.), Blue Sky L. Rep. P 74,507

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy
2004 WL 3101575 (D.Del.)
(Cite as: 2004 WL 3101575 (D.Del.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(Formerly Known as Mosler, Inc.) and its
Affiliates, as Assignee of Certain Claims Pursuant
to the Second Amended Joint
Plan of Liquidation of MDIP, Inc. and its Affiliates,
Plaintiff,
v.
Michael RAPOPORT, William A. Marquard,
Thomas R. Wall, IV, Robert A. Young,
III, and Kelso & Co., Inc., Defendants.
No. C.A. 03-779(GMS).

Nov. 29, 2004.

Michael F. Bonkowski, Mark Minuti, Saul Ewing
LLP, Wilmington, DE, for Plaintiff.

Paul J. Lockwood, Eric M. Davis, Skadden, Arps,
Slate, Meagher & Flom, Wilmington, DE, for
Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On August 5, 2003, plaintiff Litigation Trust of
MDIP, Inc. ("Mosler") filed a complaint against the
above-named defendants (D.I. 1), and on February
9, 2004, filed an amended complaint (D.I.28),
which states four causes of action. The first two
causes of action are for breach of the fiduciary
duties of due care, good faith and loyalty, with
Count I against defendants Marquard, Wall and
Young (collectively, the "Kelso Directors") (id.¶¶
81-84), and Count II against defendant Rapoport (id.
¶¶ 85-88). In Count III, Mosler seeks avoidance
and recovery of constructively fraudulent transfers

under 11 U.S.C. § 548(a)(1)(B) against Kelso &
Co., Inc. ("Kelso"). (D.I. 28 ¶¶ 89-94.) Similarly,
in Count IV Mosler seeks avoidance and recovery
of constructively fraudulent transfers under 11
U.S.C. § 544(b) against Kelso. (D.I. 28 ¶¶ 95-
101.) Currently before the court is the defendants'
March 10, 2004 motion to **dismiss** pursuant to
Fed.R.Civ.P. 12(b)(6). (D.I.35.) For the following
reasons, the court will **deny** the defendants' motion.

II. JURISDICTION

The court's jurisdiction is pursuant to 28 U.S.C. §
1332 (2004).

III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6) should be granted when,
accepting all well-pleaded factual allegations as
true, the plaintiff is not entitled to relief as a matter
of law. *See In re Burlington Coat Factory Sec.
Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997). "A
complaint should be dismissed only if, after
accepting as true all of the facts alleged in the
complaint, and drawing all reasonable inferences in
the plaintiff's favor, no relief could be granted under
any set of facts consistent with the allegations of the
complaint." *See Trump Hotels & Casino Resorts,
Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d
Cir.1998). In a motion to dismiss for failure to state
a claim, the moving party has the burden of
persuasion. *See Kehr Packages, Inc. v. Fidelcor,
Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991). While the
court must accept the factual allegations in the
complaint as true, it "need not credit a complaint's
'bald assertions' or 'legal conclusions.' " *See In re
Burlington Coat Factory Sec. Litig.,* 114 F.3d at
1429 (citation omitted). Therefore, "[a] complaint
which consists of conclusory allegations
unsupported by factual assertions fails even the
liberal standard of Rule 12(b)(6)." *De Jesus v.
Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996)

IV. BACKGROUND

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
**(Cite as: 2004 WL 3101575 (D.Del.))**

In its amended complaint, Mosler alleges the detailed set of facts (totaling 80 paragraphs) on which it bases its four claims for relief. (D.I.28.) The following is a brief summary of that background. For the purpose of this motion, the court assumes all allegations of fact to be true.

"Through leveraged buyouts in 1986 and 1990, Kelso acquired control of Mosler, a manufacturer of physical security products and systems, and installed defendants Marquard, Wall and Young (collectively, the 'Kelso Directors') on Mosler's Board of Directors...." (Id.¶ 2.) From 1992 to 1995, Mosler's sales increased from $203.7 million to $216.9 million. (Id.¶ 26.) Then, in 1995, defendant Rapoport was hired as President and CEO of Mosler (id.¶ 30), despite the fact that he had no prior experience as a CEO of a company of Molser's stature (id.¶ 33). The Kelso Directors allegedly consented to his hiring on the basis of two lines in a one-page memorandum written by the outgoing CEO. (Id.¶ 30.) There was no discussion of "succession planning" at either of the two board meetings immediately preceding Rapoport's hiring (id.¶ 29), and there was no consideration of any alternative candidates (id.¶ 31).

*2 In October 1998, Mosler acquired another security business, named LeFebure, from a company called De La Rue for $39.2 million. (Id.¶ 36.) Prior to the acquisition, Rapoport had assumed responsibility for Mosler's due diligence without formal board approval. (Id.¶ 38.) However, he failed to hire outside consultants to assist in the valuation and due diligence process, relying instead on numbers provided by De La Rue and the evaluations of his own personnel. (Id.¶ 39.) The Kelso Directors gave their approval to begin negotiations with De La Rue at a special September 1998 board meeting, but did so without the benefit of any tangible information concerning the proposed acquisition. (Id.¶ 40.) Unfortunately, LeFebure's financial condition was not as good as was originally represented by De La Rue. (Id.¶ 42.) Thus, it turned out that Mosler had grossly overpaid for LeFebure. (Id.) This problem was compounded by the fact that Rapoport failed to retain key personnel from LeFebure (id.¶ 43) and otherwise mismanaged the integration of the two businesses (id.¶ 45), resulting in "a serious deterioration of Mosler's liquidity (id).

Subsequent to the LeFebure acquisition, mismanagement by Rapoport and the Kelso Directors continued. In 1999, Mosler attempted to convert to a new enterprise software system, which was essential to the proper functioning of its business. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house information technology ("IT") employees that this type of conversion would require them to hire outside specialists. (Id.¶ 47.) However, Rapoport ignored this advice and, with the approval of the Kelso Directors, set out to convert the new system using only the in-house IT staff. (Id.¶¶ 48-49.) As a result, the conversion was not entirely successful, and for the next several years Mosler had difficulty invoicing customers, collecting receivables, tracking inventory, etc. (Id.¶ 50.) Furthermore, Rapoport failed to address "sustained and systematic flaws" in Mosler's inventory management system, resulting in untimely deliveries to customers and a loss of goodwill. (Id.¶¶ 52-53.) Rapoport and the Kelso Directors also failed to institute standard internal control procedures for ensuring timely invoicing of customers and collection of accounts receivable. (Id. ¶ 54.) As a result, Mosler's accounts receivable rose from $46 million in 1995 to nearly $100 million in 1999. (Id.¶ 55.) Yet, there was no discussion of these problems at either the February 1999 board meeting or the May 1999 board meeting. (Id.¶¶ 56-57.) Thus, Mosler contends, the Kelso Directors' failed to properly monitor Rapoport's management of the company or to investigate the sudden explosion of the accounts receivable. (Id.¶ 58.)

"Moreover, on at least ten occasions between November 1997 and January 2001, certain of the Kelso Directors were approached by veteran, senior Mosler employees about the threat that Mosler's serious business problems and Rapoport's gross mismanagement posed to the company." (Id.¶ 60.) Rapoport allegedly fired at least one of these employees in response to the complaints, and effectively forced another to resign. (Id.) Instead of investigating these reports of mismanagement and attempting to address the problems identified, the Kelso Directors ignored the reports and "actively took steps to ensure that any additional concerns of Mosler's employees would not be brought to the Board's attention." (Id.¶ 61.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
**(Cite as: 2004 WL 3101575 (D.Del.))**

**\*3** Mosler's financial problems become so serious that its outside auditor and independent accountant, Deloitte, issued a letter in September 1999 to Mosler's board advising it that the matters summarized in the letter were "reportable conditions" with respect to the company's internal controls. (Id.¶ 66.) " 'Reportable conditions' are significant deficiencies in the design or operation of internal control, which could adversely affect Mosler's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements." (Id.) Accompanying Deloitte's letter was a report identifying more than forty problems with Mosler's internal controls and suggesting corrective action. (Id.) These problems included:

    1. Failure to reconcile the progress billings detail to the general ledger;
    2. Duplication of invoices for time and materials;
    3. Failure to post cash disbursements in a timely fashion, resulting in "unusual reconciling items;"
    4. Unexplained discrepancies in reported accrued vacation time between the detail and the general ledger;
    5. Lack of corporate oversight and accountability with respect to service contracts, resulting in lost contracts; and
    6. Inaccurate and untimely fulfillment of branch orders for replacement parts from headquarters.

(Id.¶ 67.) Neither Rapoport nor the Kelso Directors took any corrective action in response to Deloitte's warning. (Id.¶ 68.)

Again in November 2000, Deloitte issued another letter to the board advising it that the conditions reported in the letter were "material weaknesses." (Id.¶ 70.) "A material weakness is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts material to Mosler's financial statements might occur and not be detected within a timely period by Mosler's employees." (Id.) This letter also included a report, this time identifying over fifty problem areas, many of which were identified in the 1999 letter and report. (Id.¶ 71.) Again, neither Rapoport nor the Kelso Directors took any remedial action. (Id.¶ 72.) Consequently, Mosler alleges that Rapoport and the Kelso Directors knew or were on constructive notice that the financial statements

and results prepared by Mosler's management were materially misstated and misleading. (Id.¶ 73.) Specifically, the management reported a net loss in 2000 of nearly \$11 million, while the net loss reported in Mosler's audited financial statements was nearly \$22 million. (Id.¶ 74.)

Mosler's financial problems continued in this direction until August 6, 2001, when it filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Id.¶ 79.) On or about October 17, 2001, Mosler's assets were sold at auction for nearly \$28 million, but Mosler's unsecured creditors did not receive any distribution from the proceeds of the sale. (Id.¶¶ 79-80.) There is more than \$200 million in unsecured debt. (Id.¶ 4.) Mosler now seeks to recover, on behalf of the unsecured creditors, damages for breach of fiduciary duties by Rapoport and the Kelso Directors, as well as management fees fraudulently transferred to Kelso by Mosler in the years prior to its bankruptcy. (Id.¶ 5.)

**V. DISCUSSION**

**A. COUNT I--Breach of Fiduciary Duty Against the Kelso Directors**

**\*4** Mosler alleges the Kelso Directors breached their fiduciary duties by failing to be informed before making business decisions, failing to employ rational business practices, failing to take action in circumstances where due attention would have prevented harm, failing to exercise good faith judgment with regard to Mosler's information and reporting systems, ignoring deficiencies in Mosler's internal control system and the account improprieties reported to them, and failing to ensure the accuracy and reliability of Mosler's financial statements. (D.I.28.¶ 83.)

The Kelso Directors argue that this breach of fiduciary duty claim is barred by Mosler's certificate of incorporation, which limits the liability of directors to the corporation or stockholders pursuant to Del.Code Ann. tit. 8, § 102(b)(7). Specifically, the certificate of incorporation provides:

    No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
(Cite as: 2004 WL 3101575 (D.Del.))

a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.
(D.I. 25 at A134.) Mosler counters by citing two non-binding cases for the proposition that such provisions are inapplicable when the action is brought for the benefit of creditors in a bankruptcy proceeding. *See Ben Franklin Retail Stores, Inc. v. Kendig,* No. 97C7934, 2000 U.S. Dist. LEXIS 276, at * 23-*24 (N.D.Ill. Jan. 12, 2000); *Pereira v. Cogan,* No. 00 Civ. 619(RWS), 2001 U.S. Dist. LEXIS 2461, at *29-*38 (S.D.N.Y. Mar. 13, 2001).

The court finds persuasive a recent (but unpublished) decision of the Court of Chancery of Delaware, in which Vice Chancellor Noble applied § 102(b)(7) in a suit brought by unsecured creditors against the directors of a company in bankruptcy. *See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,* No. Civ. A. 20228-NC, 2004 WL 1949290, at *9 (Del.Ch. Aug.24, 2004). Although *Elkins* did not directly address the issue presented here, it is clear that application of § 102(b)(7) in cases involving creditors was not seen as problematic. Therefore, the court believes Delaware law permits defensive use of § 102(b)(7) provisions even when the suit is for the benefit of a creditor.

As a result, it would seem that the duty of care portion of Count I could be dismissed, leaving only the duty of loyalty/good faith portion to be scrutinized for the requisite factual allegations. However, "[k]nowing or deliberate indifference by a director to his or her duty to act faithfully *and with appropriate care* is conduct ... that may not have been taken honestly and in good faith to advance the best interests of the company." *In re The Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch. May 28, 2003) (emphasis added). In other words, "[w]here a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either 'not in good faith' or involve 'intentional misconduct' [of

the type contemplated by § 102(b)(7) ]." *Id.* at 290. Thus, regardless of whether the claim is labeled as a breach of the duty of care, loyalty, or good faith, when a § 102(b)(7) provision is involved the underlying alleged facts must tend to show that the defendants *"knew"* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* at 289 (emphasis in original).

*5 Viewing the totality of the allegations, the court believes Mosler has met its burden of alleging facts sufficient to show that the Kelso Directors *"knew"* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." While it may be the case that the Kelso Directors were justified in each and every decision they made, it would be inappropriate for the court to make such a determination before adequate discovery has taken place. Thus, the defendants' motion to **dismiss** with regard to Count I will be **denied.** [FN1]

> FN1. The defendants also argue that the business judgment rule insulates them from liability. The defendants' formulation the business judgment rule is that there can be no liability "so long as the directors' decision 'can be attributed to any rational business purpose.' " (D.I. 36 at 24.) Since the court finds that Mosler has alleged facts sufficient to show (if proven) that the defendants *"knew"* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss," then those decisions surely could not be attributable to any rational business purpose.

B. COUNT II--Breach of Fiduciary Duty Against Rapoport

The factual basis for Count II is largely the same as for Count I. However, Mosler argues that the §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
(Cite as: 2004 WL 3101575 (D.Del.))

102(b)(7) provision in its charter is additionally inapplicable to Rapoport because he is both an officer *and* a director, whereas § 102(b)(7) is limited on its face to directors. Rapoport counters by arguing that "[w]here a defendant was both an officer and a director, he can only be sued for actions taken solely as an officer, and the plaintiff must 'highlight any specific actions [the defendant] undertook as an officer (as distinct from a director)' " (D.I. 50 at 2.) Here, he says, Mosler has not made any specific distinctions, so the § 102(b)(7) provision should protect him. (Id.)

To the extent that Rapoport acted in his capacity as a director, the § 102(b)(7) provision applies to him in the same way it applies to the Kelso Directors. In other words, the plaintiff must allege facts sufficient to show that Rapoport *"knew* that [he was] making material decisions without adequate information and without adequate deliberation, and that [he] simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." To the extent that Rapoport acted solely in his capacity as an officer, he is not insulated by the § 102(b)(7) provision at all.

Therefore, the defendants' motion to **dismiss** Count II of the complaint will be **denied**.

C. COUNTS III & IV--Constructively Fraudulent Transfers

In Counts III and IV, Mosler seeks to avoid and recover for constructively fraudulent transfers from Mosler to Kelso totaling $150,000 and $800,000 in violation of 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. The defendants argue that Mosler's amended complaint merely restates the elements of constructive fraud under these sections, without asserting any facts to support its claims. (D.I. 36 at 36-38.) Admittedly, the factual allegations supporting these claims are sparse. However, Mosler does allege two specific amounts it paid to Kelso for "management fees" and that it received nothing in return. (D.I. 28 ¶¶ 89-101.) It is also true that Mosler filed for bankruptcy during the relevant time period, which tends to shore up Mosler's assertion that the transfers were completed during insolvency or that the transfers rendered the company insolvent. Therefore, the court believes it would be premature to **dismiss** these claims before

adequate discovery. Thus, the defendants' motion to **dismiss** Counts III and IV will be **denied**.

V. CONCLUSION

**\*6** For the aforementioned reasons, the defendants' motion to **dismiss** all counts of the plaintiff's amended complaint will be **denied**.

*ORDER*
IT IS HEREBY ORDERED that:

The defendants' motion to **dismiss** all counts of the second amended complaint (D.I.35) be **DENIED**.

2004 WL 3101575 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

. 1:03CV00779 (Docket)
                              (Aug. 05, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.